IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 1:24CR198-APM |
| v. | ) | |
| | ) | |
| CURTIS DAVIS | ) | |

**MR. DAVIS' SENTENCING MEMORANDUM**
**AND REQUEST FOR A DOWNWARD VARIANCE**

NOW COMES the Defendant, Curtis Davis ("Mr. Davis"), by and through his attorneys, Lisa Costner and Ira Knight, and respectfully requests the Court to consider the following sentencing factors relevant to 18 U.S.C. § 3553(a).

## PROCEDURAL HISTORY AND FACTS

A. Procedural History

On April 24, 2024, a one-count information was filed alleging a violation of 18 U.S.C. §111(a)(1), Assaulting, Resisting, or Impeding Certain Officers. Doc. 24. Thereafter, on June 10, 2024, Mr. Curtis pled guilty to the count in the information.

A plea agreement and statement of offense were filed, and the following guideline computation with respect to Count 1 was agreed to by the parties:[1]

| | |
|---|---|
| U.S.S.G. § 2A2.2 Base Offense Level | 14 |
| U.S.S.G. § 3A1.2 Official Victim | +6 |
| U.S.S.G. § 3E1.1 Acceptance of Responsibility | -3 |
| Total | 17 |

A presentence report ("PSR") was prepared which agreed with the guideline calculations

---

[1] Doc. 28 and 29.

1

in the plea agreement. PSR ¶ 106. Mr. Davis did not object to the PSR. Mr. Davis has three criminal history points; therefore his criminal history category is II. PSR ¶ 55. Based on a total offense level of 27 and a criminal history category of II, Mr. Davis's advisory guideline range is 27 – 33 months. PSR ¶ 104.

He respectfully requests that this Court grant him a downward variance from the advisory guideline range to a sentence of five years of probation with an additional requirement of six months of home detention.

B. Statement of Facts

On January 6, 2021, Mr. Davis and his then-girlfriend (and co-defendant) Tanya Bishop[2] attended the "Stop the Steal Rally" at the U.S. Capitol. Shortly after 3:00 p.m., they entered the building through the East Rotunda doors along with a throng of people. Doc. 29. Once inside, they walked past uniformed law enforcement officers as they made their way deeper into the building. *Id.* A few minutes later, they found themselves facing a line of officers inside the Rotunda. *Id.* During the confrontation between the large group of people inside the Capitol and the officers, Mr. Davis made physical contact with an officer, punching him in his helmet. *Id.* He also grabbed a riot shield from an officer. *Id.* A few minutes later, Mr. Davis used the shield to push rioters, resulting in the officers being pushed. *Id.*

Eventually, Mr. Davis and Ms. Bishop were cleared from the building by police officers. *Id.* They returned to the East Rotunda approximately eight minutes later and attempted to re-enter the building. *Id.* Officers blocked them from entering and during the fray, Mr. Davis

---

[2] Ms. Bishop is listed on page 2 of the presentence report as related case 1:24CR299-1-APM. She is not listed as a codefendant in paragraph 32, presumably because her case was docketed separately as of June 24, 2024.

2

punched the riot shield of one of the officers three times. *Id.* While outside the Capitol building, Ms. Bishop climbed on top of a law enforcement vehicle and began yelling at the crowd, encouraging them to reenter the Capitol building. *Id.* Mr. Davis filmed Ms. Bishop's efforts with his phone. *Id.* Later that evening, Mr. Davis recorded a video of his fist and admitted on camera to assaulting a law enforcement officer. *Id.*

Mr. Davis was arrested on December 8, 2023, and released on a personal recognizance bond on December 11, 2023. PSR, p. 1. He has remained out of custody on pretrial release and "[a]ccording to information received from the United States Probation Office for the Eastern District of North Carolina, the defendant is compliant with his conditions of release." PSR ¶ 13. Mr. Davis is scheduled for sentencing on October 18, 2024.[3]

## REQUEST FOR A VARIANCE

Mr. Davis requests the Court to consider the following sentencing factors relevant to 18 U.S.C. § 3553(a) and find that a sentence of five years of probation with six months of home detention is sufficient, but not greater than necessary.

A. The Nature and Circumstances of the Offense

1. *Mr. Davis's Former Relationship with Ms. Bishop*

Mr. Davis met Ms. Bishop at a flag rally prior to the 2020 presidential election. The two bonded over their support of President Trump's bid for re-election. The couple attended political rallies together, including one where Trump was the speaker. They experienced no issues with violence during these rallies. After the election, they decided to attend the "Stop the Steal" rally in Washington, D.C. which was scheduled to take place on January 6, 2021. Mr. Davis and Ms.

---

[3] On August 22, 2024, Ms. Bishop pled guilty to the same offense as Mr. Davis in a one-count information and is scheduled for sentencing before this Court on January 9, 2025. (1:24CR299).

Bishop arrived in Washington a couple of days before the rally. During that time, they socialized with other attendees from North Carolina.

On the morning of the rally, Mr. Davis had no premeditated intention of engaging in violence. He arrived with Ms. Bishop, and the two waited in the crowd to hear Trump speak. Before Trump finished speaking, they left the area and headed to the hotel so that Ms. Bishop could use the bathroom. As they left the hotel, they rejoined the crowd at the Capitol.

Mr. Davis and Ms. Bishop observed multitudes of people entering the Capitol building. The two followed the crowd inside the Capitol building. Once inside, they encountered utter mayhem. All around them, people were pushing and screaming. Officers were pushing back in an effort to control the crowd and prevent further entry into the building. The result was physical violence.[4] At one point, the two were trapped between the crowd and the door, unable to move. Mr. Davis observed Ms. Bishop being pushed which caused him to feel protective of her. He also observed Ms. Bishop's attempts to aggressively move forward and, at times, he physically held her back to keep her safe. Mr. Davis's protective instincts played a large part in committing the assaultive actions against the officers. Mr. Davis and Ms. Bishop exited the building after being removed by the law enforcement officers. At one point, Ms. Bishop climbed on top of a law enforcement vehicle and began yelling at the crowd, encouraging them to enter the Capitol. After they were removed from the Capitol building, Ms. Bishop insisted on returning, and Mr. Davis accompanied her back to the Capitol. This time officers prevented them from re-entering the building and the two went back to the hotel.

---

[4] As reflected in the Statement of Offense, Mr. Davis accepts responsibility for his conduct on January 6. He regrets his assaultive actions related to each of the officers impacted by his conduct, and especially officers M.H. and A.J.

Ms. Bishop has a sustained history of criminal convictions, including seven separate convictions for prostitution-related offenses spanning 21 years. Further, she has prior convictions related to assault, armed robbery, and drug use. Mr. Davis's criminal history is not as lengthy as Ms. Bishop's, but it is notable for prior assault convictions.[5] Both Mr. Davis and Ms. Bishop have struggled with substance abuse issues. Mr. Davis has been forthright about his history of opiate addiction, beginning with his use of pain medication which developed after being prescribed Percocet due to a back surgery. PSR ¶85. At the time of the instant offense, he was also abusing alcohol.[6] *Id.* Mr. Davis reports that alcohol abuse was a significant part of his relationship with Ms. Bishop. PSR ¶83. Ms. Bishop was often the driver of their relationship and Mr. Davis was willing to let her call the shots.




[7]

---

[5] Mr. Davis acknowledges his struggle with anger management. He has sought anger management treatment since the events of January 6 and is willing to continue to address these issues through professional counseling. PSR ¶79.
[6] Mr. Davis addressed his opiate addiction by participating in a methadone program and has remained "clean" since then. *Id.*
[7] Images herein are reproductions of discovery provided by the Government.

Soon after their return to North Carolina, Mr. Davis and Ms. Bishop ended their relationship. As he looked back on the events of January 6, Mr. Davis regretted his actions. PSR ¶38. In retrospect, he was uncomfortable with Ms. Bishop's extreme political fervor which helped fuel the bad choices he made on that day. The two soon went their separate ways.

2.  *"Honor Culture" Played a Role in the Nature and Circumstances of the Offense*

Mr. Davis accepts responsibility for his wrongful acts and is meaningfully remorseful for those acts. Mr. Davis's behavior at the rally was driven, in part, by the presence of Ms. Bishop and perceived threats to her physical safety. Mr. Davis acknowledges that both he and Ms. Bishop voluntarily placed themselves in harms way through their actions. However, he now recognizes that his actions on January 6 were a "bad thing" and "I should not have been their [sic] and wish I could go back and change things." PSR ¶38. Notably, Mr. Davis had not received relevant mental health treatment prior to the events of January 6. Today, Mr. Davis is not only amenable to relevant mental health treatment, he has specifically sought mental health treatment, including medication.

Nonetheless, undersigned counsel submits that, on January 6, it was easier for Mr. Davis to rationalize violence against the victims in this case when that violence was framed as being protective of Ms. Bishop. While that viewpoint is not entirely consistent with an objective understanding of the insurrection, it does partially explain Mr. Davis's subjective understanding and, coupled with Mr. Davis's sense of right and wrong, help explain why Mr. Davis was willing to engage in violence. In short, it was mentally easier for Mr. Davis to violently respond when his girlfriend was imperiled. The following is presented to explain how Mr. Davis's formative life experiences meshed with the circumstances present during the insurrection.

"Cultures of honor are societies that strongly emphasize values of loyalty and integrity, as

well as the need to defend and maintain one's reputation."[8]  "From an early age, small boys were taught to think much of their own honor and to be active in its defense. Honor in this society meant a pride of manhood in masculine courage, physical strength, and warrior virtue."[9] "Historians and other observers have often noted that, in the South, men have had to take action against insults or else lose status before their family and peers." *Cohen* at 946. "The South's approval of violence seemed limited to violence used for self-protection, to respond to an insult, or to socialize children." *Cohen* at 946. "Thus, although southern white males were not more likely to endorse statements about violence in general ('Many people only learn through violence'), they were more willing to endorse violence when it was used to protect … or to answer an affront ('*approving of a man punching a stranger who 'was drunk and bumped into the man and his wife on the street'*')." *Cohen* at 946 (emphasis added).

"Reputational defense is often exacted through the use of physical aggression and displays of strength and fearlessness, thereby demonstrating that one actually *possesses* esteemed masculine qualities. Jarrod at 1 (citing *Barnes* et al., 2012; *Cohen*, 1998; *Cohen* et al., 1996; *Nisbett & Cohen*, 1996). "Southern white males were also more likely to stigmatize men, described in brief scenarios, who did *not* respond with violence, criticizing them for being 'not much of a man' if they failed to fight or shoot the person who challenged or affronted them." *Cohen* at 946.

---

[8] To be liked or feared: Honor-oriented men's sensitivity to masculine reputation concerns depends on status-seeking strategy, Jarrod E. Bock and Ryan P. Brown, Personality and Individual Differences 173 (2021) (hereinafter: "Jarrod").

[9] Insult, Aggression, and the Southern Culture of Honor: An "Experimental Ethnography", Dov Cohen, Richard Nisbett, Brian Bowdle, and Norbert Schwarz, Interpersonal Relations and Group Processes (1996).



In the video provided by the Government, Mr. Davis acts inappropriately aggressive and assaultive against law enforcement, especially after he perceived threat toward Ms. Bishop. Mr. Davis should have de-escalated the situation. However, he did not. Undersigned submits the above information to support the argument at sentencing that once Mr. Davis perceived a physical threat to Ms. Bishop, there existed a situation where the social energy required to de-escalate the confrontation was elevated to a level that Mr. Davis lacked the tools to defuse, absent intervention by a third-party.

Further, the Government's evidence supports the narrative that Mr. Davis was playing a protective role to Ms. Bishop. In the two images depicted on the following page, Mr. Davis has his arm protectively wrapped around Ms. Bishop.





In addition to providing physical protection to Ms. Bishop, Mr. Davis also supported Ms. Bishop's political ambitions by, as depicted below, assisting her filming her efforts, and also filming Ms. Bishop during her time atop the law enforcement vehicle.



B. <u>Mr. Davis's History and Characteristics</u>

Mr. Davis, 45 years old, is a lifelong resident of North Carolina. He grew up in a rural part of eastern North Carolina, in a two-parent home. He has worked hard his entire life, beginning at the age of 12, when he worked in tobacco and cucumber fields.[10]

After Mr. Davis completed the 8th grade, he did not go back to school. Despite this lack of formal education, Mr. Davis has continuously maintained gainful employment. After leaving school, he obtained a work permit. From 2005 to present, he has primarily been employed installing vinyl siding, and in 2022, started his own business in that field: "East Carolina Exteriors." PSR ¶91. Mr. Davis has also been employed as a glazier and as a welder, earning his welding certificate in 2008. PSR ¶¶ 93, 94.

Mr. Davis is the father of six children and provides financial support to them. PSR ¶¶ 68-70. His youngest child is less than one year old and he has two teenage daughters who live with his partner Melissa Davis. PSR ¶70. His children are an important part of his life and he strives to be a good example for them.



---

[10] Mr. Davis's work in the tobacco fields at such a young age led to him suffering from tobacco poisoning, which notably was untreated. PSR ¶77.

After the events of January 6, Mr. Davis recognized that he was suffering from depression and anxiety. PSR ¶79. He sought treatment and is now on medication to assist him with his diagnosis. *Id.* He has also sought counseling and anger management. *Id.* He is committed to addressing the mental health issues that may have contributed to his actions on January 6 and to maintain his sobriety.

As he looks back on the events of January 6 and his behavior on that day, Mr. Davis is very remorseful and embarrassed. As he stated during his presentence interview, "It was a bad day and bad thing all the way around. I should not have been their [sic] and wish I could go back and change things." PSR ¶38. Unlike many, he has considered this a wake-up call and has taken steps to ensure that he never finds himself behaving as he did on that fateful day. He is committed to continuing his medication and counseling as long as he can afford to do so.

C. The Need to Reflect the Seriousness of the Offense, Promote Respect for The Law, to Provide Just Punishment, and to Protect the Public.

Five years of probation with six months of home detention will serve the goals of reflecting the seriousness of the offense, provide just punishment and will protect the public. Mr. Davis will be restricted to his home, where he can care for his minor children, for six months. After that, he will be closely supervised by a United States Probation Officer and will be required to abide by all of the mandatory and special conditions of supervision. This supervision will ensure that Mr. Davis complies with both mental health and substance abuse treatment. He will face prison time if he fails to do so. A sentence of five years of probation with six months of house arrest is sufficient but not greater than necessary to achieve these sentencing goals.

D. <u>The Need to Avoid Unwarranted Sentence Disparities</u>

1. *Comparable Sample of J6 Cases*

To date, over 100 January 6 defendants have been sentenced after a conviction under 18 U.S.C. § 111(a). Many of these defendants were convicted of multiple offenses. However, a significant subset of defendants were convicted of a sole count of § 111(a). The following cases are highlighted as particularly comparable to Mr. Davis's case:

Similar Cases

| Defendant | Case Number | Statute of Conviction | Government Requested Sentence | Guideline Range in P.A. | Sentencing Result (less $2,000 rest.) | Summary of Statement of Offense |
|---|---|---|---|---|---|---|
| Russell, Bobby | 1:23-CR-00029-APM | 18 U.S.C. §111(a)(1) | 30 months' incarceration 36 months' supervised release $2,000 restitution | BOL 14 O. Vic.+6 AOR: -3 TOL: 17 CHC: IV 37 – 46 | 12 months' & 1 day incarceration 24 months' supervised release 6 months' home dent. 250 hours' community service | Defendant responsible for destruction of bike barricade. He assaulted a female MDP Officer, pulling her to the ground and down a flight of stairs. Forcefully attempted to pull OC spray cannister from officer. Second encounter where he pushed back against officers trying to clear an area. Present at the Capitol for over two hours. Consistently verbally abusive. https://ecf.dcd.uscourts.gov/doc1/045110012040 |
| Brody, Joseph | 1:24-CR-00067-DLF | 18 U.S.C. § 231 18 U.S.C. § 111(a)(1) | 30 months' incarceration 36 months' supervised release $2000 restitution | BOL 14 O. Vic.+6 AOR: -3 TOL: 17 CHC: I 24 – 30 | 18 months' incarceration 36 months' supervised release 50 hours' community service | One of five defendants who acted as a group. After leaving the rally at the Ellipse, went inside the Capitol and pushed past officers. Roved around the Capitol and went into the Pelosi suite. Defendant broke off from group and went into the Senate Chamber to photograph documents on top of an inside several senator's desks. Thereafter, moved to the north side and struck officers with a metal barricade, then stole media equipment and destroyed a corded phone. https://ecf.dcd.uscourts.gov/doc1/045110504054 |

| Name | Case | Statute | Sentence | Guidelines | Gov't Req. | Conduct |
|---|---|---|---|---|---|---|
| Honigford, Matthew | 1:24-CR-00078-TSC | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | BOL 14 O. Vic.+6 AOR: -3 TOL: 17 CHC: I 24 - 30 | 19 months' incarceration 24 months' supervised release | The defendant used a flag pole to push against an MPD officer's chest, resulting in a 20 second struggle. Thereafter, touched multiple officers to pray for them. Later, kicked a bike rack against an officer. https://ecf.dcd.uscourts.gov/doc1/045110482388 |
| Lockwood, Michael | 1:23-CR-00146-RDM | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | BOL 14 O. Vic.+6 AOR: -3 TOL: 17 CHC: I 24 - 30 | 12 months' and 1 day incarceration 36 months' supervised release | The defendant resisted removal from an elevated platform. Thereafter, grabbed a baton from an officer to prevent that officer from controlling another armed rioter. The defendant stole the baton and the bragged about it on social media. https://ecf.dcd.uscourts.gov/doc1/045110066461 |
| Brackley, Matthew | 1:24-CR-00009-CJN | 18 U.S.C. § 111(a)(1) | 28 months' incarceration 36 months' supervised release | BOL 14 O. Vic.+6 AOR: -3 TOL: 17 CHC: I 24 – 30 | 15 months' incarceration 24 months' supervised release $1,000 fine | Prior to J6, the defendant emailed senators urging them to support Donald Trump. The defendant went inside the Capitol and had several points of contact with officers. The defendant encouraged others to go deeper into the Capitol, and physically pushed through more officers. He was inside over 40 minutes. https://ecf.dcd.uscourts.gov/doc1/045110413091 |

15

| Adams, Justin Dee | 1:22-CR-00350-JEB | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | BOL 14 O. Vic.+6 AOR: -3 TOL: 17 CHC: I 24 - 30 | 17 months' incarceration 12 months' supervised release | Defendant pushed against officers holding a perimeter outside the Capitol. Later charged against the perimeter line and struck several officers. Later, grabbed a metal bike rack from an officer. Then threw a plastic bottle at an officer. Then pulled the bike rack away into the crowd. https://ecf.dcd.uscourts.gov/doc1/045110130346 |
| Farris, Jason | 1:23-CR-00068-AMJ | 18 U.S.C. § 111(a)(1) | 27 months' incarceration 36 months' supervised release $2,000 restitution | BOL 14 O. Vic.+6 AOR: -3 TOL: 17 CHC: I 24 - 30 | 18 months' incarceration 24 months' supervised release | The defendant assaulted an officer by striking the officer's baton, and later shoved an officer with two hands, knocking the officer to the ground and aiding other rioters taking a bike rack into the crowd. The defendant also used a flagpole to hit a window several times, entered the capitol. https://ecf.dcd.uscourts.gov/doc1/045110261331 |

As demonstrated by the chart above, Courts are universally amenable to downward variant outcomes. Notably, the guideline range applicable to Mr. Davis's case is 27 to 33 months. PSR ¶104. Like the defendant in *United States v. Russell*, *supra*, Mr. Davis does not squarely fit within Criminal History Category I. Moreover, the assaultive conduct in the presentence report does not include use of a weapon; makeshift or otherwise. He did not throw a water bottle or other object at law enforcement. Mr. Davis did not use a bike rack to assault officers. He did not pull an officer to the ground. Although, Mr. Davis had multiple interactions with law enforcement on January 6, his conduct on that day falls within the mitigated spectrum of J6 convictions under 18 U.S.C. § 111(a).

2. *Cited JSIN Data is Potentially Misleading*

The presentence report includes information from the Judiciary Sentencing Information database. PSR ¶127. The information cited in the presentence report states that, "For the 21 defendants (95) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 27 month(s) and the median length of imprisonment imposed was 27 month(s)." PSR ¶127. However, as shown below, there were many more downward variant sentences (36%) than there were upward variant sentences (9%).



Note: The figure includes the 22 defendants reported to the Commission whose primary guideline was §2A2.2, with a Final Offense Level of 17 and a Criminal History Category of II, including defendants who received a §5K1.1 substantial assistance departure. Cases missing information necessary to complete the analysis were excluded from this figure. Defendants who received a §5K1.1 substantial assistance departure are included in this analysis but are excluded from other analyses below. As such, the number of defendants included in this analysis may exceed the number of defendants in other analyses. Total percentages displayed in the figure may not sum to 100% due to rounding.

Generally, JSIN data does not provide a level of granularity with which to compare sentencing disparities "among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. 3553(a)(6). Further, the cases from this district cited in the "Similar Cases" chart above demonstrate how small variations in each case can distort the picture that the JSIN data presents. For example, some of the defendants in the above chart had 1 criminal history point, as opposed to 3 criminal history points. While these criminal history differences *may* be meaningful, they are not necessarily meaningful. As above, this Court found that a sentence of 12 months and 1 day was sufficient, but not greater than necessary for a defendant with a Criminal History Category of IV. Thus, given the wide range of paths that a given defendant can arrive at Offense Level 17 and Criminal History Category II, the JSIN data is so vague that it does not merit consideration in this case.

## CONCLUSION

For the reasons stated herein, Mr. Davis respectfully requests that this Court vary downward from the advisory guidelines range of 27 – 33 months and sentence Mr. Davis to five years of probation with six months of home detention.

Respectfully submitted, October 11, 2024.

                                            Louis C. Allen III
                                            Federal Public Defender

                                            /s/ Lisa Costner
                                            _____
                                            LISA COSTNER
                                            Assistant Federal Public Defender
                                            North Carolina State Bar No. 14308
                                            251 N. Main Street, Suite 849
                                            Winston-Salem, NC 27101
                                            (336) 631-5278, Ext. 5172
                                            Email: lisa_costner@fd.org

                                            /s/ Ira Knight
                                            _____
                                            IRA KNIGHT
                                            Assistant Federal Public Defender
                                            North Carolina State Bar No. 43817
                                            301 North Elm St., Ste 410
                                            Greensboro, NC 27410
                                            (336) 333-5455
                                            Email: ira_knight@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Klye Mirabelli
Assistant United States Attorney

and by email to:

United States Probation Officer

Respectfully submitted, October 11, 2024.

/s/ Lisa Costner

_____

LISA COSTNER
Assistant Federal Public Defender
North Carolina State Bar No. 14308
251 N. Main Street, Suite 849
Winston-Salem, NC 27101
(336) 631-5278, Ext. 5172
Email: lisa_costner@fd.org


/s/ Ira Knight

_____

IRA KNIGHT
Assistant Federal Public Defender
North Carolina State Bar No. 43817
301 North Elm St., Ste 410
Greensboro, NC 27410
(336) 333-5455
Email: ira_knight@fd.org